IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| GLENN DAVIS,<br><br>   Plaintiff,<br><br>v.<br><br>WARDEN THOMAS WOLFE, *et al.*,<br><br>   Defendants. | Civil Action No.:  SAG-21-3003 |

**MEMORANDUM**

On November 22, 2021, self-represented plaintiff Glenn Davis filed this civil rights action concerning the conditions of his confinement at Jessup Correctional Institution ("JCI"). On April 8, 2022, defendants Warden Thomas Wolfe, Former Warden Cleveland Friday, and Former Chief Antonette[1] Washington filed a motion to dismiss or, in the alternative, motion for summary judgment. ECF 9. Davis was advised of his right to file an opposition response and of the consequences of failing to do so (ECF 10) but has not opposed the motion. No hearing is required. *See* Local Rule 105.6 (D. Md. 2021). For the reasons that follow, defendants' unopposed motion shall be granted.

**BACKGROUND**

**A.     Complaint Allegations**

On October 26, 2020, Davis states that defendant Antoinette Washington, who was "acting as the Chief of Security," ordered a search of JCI which was conducted by "five different outside groups (Intel, Officers, TAC Team, CIT and K9)." ECF 1 at 5. Davis asserts that Washington did not ensure that the officers conducting the searches were tested for COVID-19, or that they were

---

[1] The Clerk will be directed to correct the spelling of Antoinette Washington's name.

vaccinated.  *Id*.  Additionally, Davis claims that the officers conducting the search were not provided proper PPE and none of them changed gloves after searching each inmate and each cell. *Id*.

In November 2020, Davis recalls reporting to the medical unit "several times" with complaints of severe cough and headaches.  ECF 1 at 5.  He was seen by a nurse and given Robatussin and Tylenol three times for three weeks.  *Id*.  When Davis returned with the same cough and headache, he was told that he had developed a fever.  *Id*.  Davis was given Tylenol and placed in a room alone for three hours until his fever went down.  *Id*.  The following week, Davis's symptoms had worsened, and he asked if he could be tested for COVID-19.  *Id*.  The nurse told Davis that he could not be tested for COVID-19 unless it is authorized by a doctor.  *Id*.  Davis recalls that at the time he asked for a test he was experiencing fatigue, loss of appetite, and loss of smell and taste.  *Id*.  Davis states that he has chronic health conditions – hypertension and hyperlipidemia – which were known to medical staff.  *Id*.

By December 30, 2020, Davis states he was on the floor of his cell because he could not get up.  ECF 1 at 5.  Davis's cellmate, Anthony Washington, called the tier officer over to the cell and told him that Davis had COVID, and he needed to go to the medical unit.  *Id*.  When Davis arrived in the medical unit, he told a different nurse that he had been informed by "Nurse Bea" that a doctor had to approve a COVID test, and the nurse told him that was not true.  *Id*. at 5-6. Davis was then tested for COVID-19.  *Id*. at 6.  Davis was then sent to "A Building" where he was quarantined for five days and then transferred to the JCI regional medical facility, where he was told he had COVID-19.  *Id*.  On January 3, 2021, Davis was transferred to Patuxent.  *Id*.

According to Davis, after the major shake-down and between October 2020 and January 3, 2021, outbreaks of COVID-19 occurred at JCI.  ECF 1 at 6.  He states that the worst cases occurred in C building, which was locked down for over a week.  *Id*.  Davis believes that Washington was

removed as Chief of Security at JCI as a result of the manner in which the prison-wide shake-down took place. *Id*. Davis claims Washington was moved to Dorsey Run Correctional Facility and demoted to the position of Major. *Id*.

On November 25, 2020, Davis filed an administrative remedy procedure complaint ("ARP") regarding his health and the conditions he was experiencing. ECF 1 at 6. Former Warden Cleveland Friday dismissed the ARP on January 20, 2021, incorrectly stating that the shake-down was "duly authorized," that all officers wore appropriate PPE during the search, and that Davis had not tested positive for COVID-19, nor had he exhibited any symptoms after the October 26, 2020 search. *Id*., *see also* ECF 1-1 at 6-7 (ARP with response), ECF 1-1 at 12-13 (Jan. 3, 2021 medical record indicating Davis was "COVID-19 positive"). Davis states that "[f]ollowing the prior asserted statements, [he] started experiencing severe pain in [his] hands and feet" and developed symptoms of depression and anxiety. ECF 1 at 6-7. Davis was diagnosed with "Adjustment Disorder with depressed mood" for which he was prescribed Lexapro 20mg. *Id*. at 7, *see also* ECF 1-1 at 4 (mental health treatment summary).

Davis alleges that defendants Wolfe, Friday, and Washington violated his Eighth Amendment right through "deliberate indifference, negligence, failure to protect, and the right to adequate medical care for his 'serious medical need.'" ECF 1 at 8-9. He states that each of the defendants knew "that a contagious, unprecedented, and rampant virus pandemic was occurring" and allowed JCI inmates to be exposed to the virus by "allowing five outside groups to touch and search each inmate and their cells without being tested, vaccinated, or ensuring each group had the proper PPE gear on and changed gloves after searching and touching each inmates cell." *Id*. Additionally, he faults defendants Wolfe and Friday for doing nothing to help him after they were informed of what occurred through his ARP. *Id*. He claims that Washington violated his Eighth

Amendment rights by "violating the Governor's rule of six feet distance" during the prison-wide search. *Id*. at 9-10.  As relief, Davis seeks declaratory relief and monetary damages. *Id*. at 10.

**B.     Defendants' Response**

Defendants explain that at the time of the October 26, 2020 institution-wide search at JCI, all individuals were screened for COVID symptoms prior to entering the facility.  ECF 9-1 at 2. Additionally, the officers conducting the search had to wear masks and PPE at all times.  Major Washington states that the shake-down of JCI involved "a number of different units, including K-9, Contraband Interdiction, Special Operations Group, and others."  ECF No. 9-4 at 1, ¶ 3. Washington further states that "[u]pon arrival at each institution, all individuals are greeted by both a Search Officer and a Supervisor" who are "responsible for confirming that all individuals, including correctional officers, staff, etc., are wearing appropriate PPE."  *Id*. at 1-2, ¶ 4. Washington notes that all officers are aware of the policy regarding PPE and that none of them would have been allowed to come into the institution without it.  *Id*. at 2, ¶¶ 4, 5.  Washington is unaware of any other complaints regarding the shake-down on October 26, 2020. *Id*. at ¶ 7.

Defendants have provided the court with a copy of the Department of Public Safety and Correctional Services ("DPSCS") directive, DPSCS 055.0012.06, which requires that when Contraband Interdiction Team (CIT) staff conduct searches they must "wear…(i) Sneeze guard or surgical mask; and (ii) Approved eye protection; (iii) A gown or coverall; and (iv) Gloves." ECF 9-3 at 13-14.  Additionally, at the time of the October 26, 2020 search, correctional staff were required to be tested for COVID-19.  ECF 9-5 (bulletin for mandatory testing).

Davis's medical records, also provided by defendants, establish that it was not until December 28, 2020, more than two months after the search, that Davis submitted a sick call request stating he had lost his sense of taste and smell.  ECF 9-6 at 49.  On that day, Nurse Eveline M. Bobga Tatong spoke with Davis, who informed her that he could not taste or smell anything.  *Id*.

at 48.  Tatong noted that Davis's temperature was normal and informed Davis he would be scheduled for a COVID test which required a doctor's approval.  *Id*.  Two days later, Davis submitted another sick call slip stating that he was coughing, experiencing body aches, loss of taste and headaches.  *Id*. at 47.  When seen by Nurse Nathalie T. Bih, Davis told her he had the cough for two weeks and had been given guaifenesin without improvement.  *Id*. at 46.  Bih sent Davis to A-building pending the results of his COVID test which was administered at the appointment.  *Id*.  Davis was additionally advised to continue observing precautions such as wearing his mask and social distancing.  *Id*.

On January 3, 2021, Davis's test result came back positive, and he was transferred to Patuxent Institution for isolation.  ECF 9-6 at 45.  During his stay at Patuxent from January 3 through 12, 2021, Davis did not voice any complaints related to COVID symptoms.  *Id*. at 24-44.

## STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim.  However, the complaint must allege sufficient facts to establish those elements."  *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).

Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)).  "A fact

5

is material if it 'might affect the outcome of the suit under the governing law.'" *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48 (emphasis in original). A court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. NC. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.,* 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. Motions styled in this manner implicate the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible where plaintiff has "actual notice" that the motion may be disposed of as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260-61 (4th Cir. 1998). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261.

Because Defendants filed a motion styled as a motion to dismiss, or in the alternative, for summary judgment, Davis was on notice that the court could treat the motion as one for summary

judgment and rule on that basis. Accordingly, the court will review the claims against Defendants under the Rule 56(a) standard and will consider the exhibits filed in support of the dispositive motions.

The court informed Davis that he may file an opposition and advised him of the consequences of failing to do so. ECF 10. Davis, however, has chosen not to file a response, instead relying solely on his complaint. ECF 1. Because Davis's complaint is verified, its factual assertions may be considered in opposition to defendants' motion. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991); Fed. R. Civ. P. 56(c)(1)(A).

The court is mindful that Davis is a self-represented litigant. A federal court must liberally construe pleadings filed by pro se litigants to allow them to fully develop potentially meritorious cases. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But liberal construction does not mean a court can ignore a clear failure in the pleadings to allege facts which set forth a claim. *See Weller v. Department of Social Services*, 901 F.2d 387, 391 (4th Cir.1990). A court cannot assume the existence of a genuine issue of material fact where none exists. Fed. R. Civ. P. 56(c).

## DISCUSSION

Defendants assert they are entitled to Eleventh Amendment immunity to the extent Davis has sued them in their official capacity; the allegations against them are grounded on a theory of *respondeat superior* which does not apply in § 1983 cases; the complaint fails to assert facts sufficient to reasonably conclude that defendants knew of and disregarded an excessive risk of harm to Davis during the search; Davis has failed to assert that these defendants were involved in any manner in his medical care for COVID; and any negligence claim Davis raises must be pursued through the Maryland Tort Claims Act.

### A. Official Capacity

Davis sued each of the defendants in their official and individual capacity. ECF 1 at 4, ¶ 7. Under the Eleventh Amendment to the United States Constitution, a state, its agencies, and departments are immune from citizen suits in federal court absent state consent or Congressional action. *See Pennhurst State Sch. And Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). The State of Maryland has not waived such immunity for claims brought pursuant to § 1983. Accordingly, defendants are immune from suit for actions taken in their official capacity.

### B. Personal Participation

Davis asserts that each of the defendants were aware of the manner in which the search of JCI was conducted and that Wolfe and Friday were informed via his ARP about his medical condition. ECF 1 at 8-9. Davis does not, however, describe how any of these defendants personally participated in the challenged practices utilized during the search of JCI, or how they were involved in his medical treatment.

Liability under § 1983 attaches only upon personal participation by a defendant in a constitutional violation. It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a Bivens suit). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268

F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

The undisputed record fails to support a conclusion that defendants had any constructive or actual knowledge that unsafe practices were utilized during the search of JCI, nor that any of them were aware of an unreasonable risk of harm to Davis. Rather, Davis appears to have named these defendants simply because of their job titles and positions. Likewise, there is no evidence before this Court that would reasonably support a conclusion that these defendants interfered with Davis's medical care or deliberately exposed him to COVID-19. Defendants are therefore entitled to summary judgment on the constitutional claims raised against them.[2]

**C.      Negligence Claim**

To the extent that Davis's complaint may be read to include a negligence claim, that claim shall be dismissed without prejudice. "When, as here, the federal claim is dismissed early in the case, the federal courts are inclined to dismiss the state law claims without prejudice rather than retain supplemental jurisdiction." *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-727 (1966).

---

[2] Because this Court finds that defendants are entitled to summary judgment based on their lack of personal participation in any untoward conduct, this Court will not address their other defenses.

## CONCLUSION

For the reasons stated herein, defendants' motion to dismiss or for summary judgment, construed as a motion for summary judgment, shall be granted by separate order which follows.

<u>July 19, 2022</u>                                          <u>        /s/                                        </u>
Date                                                              Stephanie A. Gallagher
                                                                       United States District Judge